# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JEANNIE MCIVER,

         *Plaintiff*,

    v.

MARK ESPER, Secretary of Defense,

         *Defendant*.

No. 16-cv-1448 (DLF)

## MEMORANDUM OPINION

Plaintiff Jeannie McIver brought this lawsuit in 2016 against then-Secretary of Defense Ashton B. Carter under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Title VII), and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* (Rehabilitation Act). McIver's amended complaint alleged mistreatment by the two components of the Department of Defense that had employed her: the Pentagon Force Protection Agency (the Pentagon) and the Washington Naval Yard (the Navy). Dkt. 18 (Am. Compl.). Following the Court's partial grant and partial denial of the Secretary's Motion for Partial Dismissal, *see* Dkt. 27, four of McIver's claims remained. Now before the Court is Secretary of Defense Mark Esper's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (Rule 56).[1] Dkt. 38 (Mot. for Summ. J.). For the reasons that follow, the Court will grant the Secretary's motion.

---

[1] Carter was Secretary of Defense when McIver filed her complaint, but Mark Esper has since taken that position and is automatically substituted as the defendant in this case under Rule 25(d) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

### A. McIver's Employment with the Pentagon

McIver started working at the Pentagon when she was appointed to a police officer position on June 29, 2014.  Def.'s Statement of Undisputed Material Facts Regarding the Pentagon (Def.'s Pentagon SUMF) ¶ 11.[2]  All new police recruits at the Pentagon must complete extensive training requirements—including the twelve-week Uniformed Police Training Program at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia—in order to gain the necessary skills, knowledge, and competencies to safely and effectively perform their duties as Pentagon police officers.  *Id.* ¶ 8.  While McIver had previously completed a different basic training program at FLETC in 2000, she had never attended the Uniformed Police Training Program that was a requirement in 2014 for all new Pentagon police recruits.  *Id.* ¶ 12.  Internal protocol makes clear that completion of all basic training is a condition of continued employment as a Pentagon police officer.  *See* Dkt. 39, Ex. 9 at 1 ("Personnel who do not successfully complete the basic training requirement shall be processed for removal from this position.").

At the time she began working at the Pentagon, McIver was the primary caregiver for her mother, who required assistance with her continuous dialysis treatment for kidney failure.  Am. Compl. ¶ 19.  On July 7, 2014, McIver informed her direct supervisor, Eric McVicker, Chief of the Pentagon Law Enforcement Training Division, that her caregiving responsibilities to her mother would not allow her to attend the required training at FLETC set to begin the following Monday in Glynco, Georgia.  Def.'s Pentagon SUMF ¶ 17.  On July 11, McVicker responded to McIver's request, instructing her to report to FLETC for the training as planned.  *Id.* ¶ 18.

---

[2] Unless otherwise noted, the facts cited in this opinion are drawn from those portions of the defendant's Statement of Undisputed Material Facts that the plaintiff has not disputed.

On July 9, 2014, in an email to McVicker, McIver invoked her rights under the Family and Medical Leave Act (FMLA). *Id.* ¶ 20; *see also* Dkt. 39, Ex. 24 at 1 ("At this time I elect to invoke my FMLA rights in order to complete training and requirements at some later time and or altered schedule."). McVicker responded to McIver's email to inform her that she needed to submit the required FMLA paperwork, including a physician's signature, before her request could be granted. Def.'s Pentagon SUMF ¶¶ 21–22. On July 10, McIver submitted updated paperwork in support of her FMLA request. *Id.* ¶ 23. McIver's updated FMLA request sought "[l]eave . . . on an as needed basis" as well as an "alternate work schedule in order to provide the maximum amount of care for my family member." Dkt. 39, Ex. 27 (July FMLA Request) at 3. Specifically, McIver sought to work an evening shift from 2 p.m. to 10 p.m., with Tuesdays and Wednesdays off, or "something similar." *Id.*

On July 20, 2014, McIver had emergency surgery to repair a ruptured ulcer. Def.'s Pentagon SUMF ¶ 30. On July 22, McIver called McVicker to advise him that she had been admitted to the hospital and received emergency surgery. *Id.* ¶ 31. McVicker forwarded this information to the Pentagon's Recruitment Medical Fitness Division (the Medical Division). *Id.* On July 30, the Medical Division received a note from McIver's treating physician, advising that McIver had recently undergone surgery and would be in post-operative recovery for approximately three to four weeks. *Id.* ¶ 32. Upon review of that documentation, the Medical Division placed McIver in a "Medical Hold Pending" status pending notice of her full recovery from surgery. *Id.* ¶ 33. On July 31, the Medical Division also informed McIver that the Pentagon's Medical Review Officer had "preliminarily determined that [McIver might] not meet one or more of [the Pentagon's] medical standards" due to her recent surgery, and that McIver would have the opportunity to submit "supplemental medical information" on or before August

11 in support of her medical clearance.  *Id.* ¶ 34; *see* Dkt. 39, Ex. 30 (Medical Division Request)

at 116.  Specifically, the Medical Division encouraged McIver to provide "all hospital records,"

including surgical operative reports, discharge narratives, and doctors' notes.  Def.'s Pentagon

SUMF ¶ 34; *see* Medical Division Request at 116.

On August 7, 2014, while still recovering from her ulcer surgery, McIver resubmitted her

FMLA request in an email to her second-level supervisor, Dennis Smith.  Def.'s Pentagon ¶ 26.

McIver's email to Smith specified, "I am not requesting leave at this time, but a suitable shift

. . . ."  *Id.*; *see* Dkt. 39, Ex. 33 (August FMLA Request) at 2.  Attached to McIver's email was

her completed FMLA request paperwork, which stated, "Requesting suitable shift as per original

[request]; 2-10pm, Tues. & Wed. off, in accordance with FMLA guidelines."  Def.'s Pentagon

SUMF ¶ 26; *see* August FMLA Request at 1.  The form noted the "purpose" of McIver's request

as the "[c]are of [a] family member" and specifically invoked the FMLA on the basis of the

"[s]erious health condition of spouse, son, daughter, or parent."  Def.'s Pentagon SUMF ¶ 26;

*see* August FMLA Request at 1.  Nevertheless, McIver testified that she believed that the

resubmission of her FMLA request also constituted a request for a reasonable accommodation

for her recently ruptured ulcer.  Plaintiff's Statement of Disputed Facts Regarding the Pentagon

(Pl.'s Pentagon SDF) ¶¶ 28, 31; *see* Dkt. 44, Ex. 4 (McIver Dep.) at 106:1–16.

On August 15, 2014, McIver emailed McVicker a "return to work" note from physician

Bobby David, dated August 13, that stated that McIver "can go back to work as light duty no

pushing, pulling, or lifting anything heavy for the next two weeks."  Def.'s Pentagon SUMF

¶¶ 35–36.  McIver did not provide this note to the Medical Division, nor did she provide any of

the hospital records that the Medical Division had requested.  Def.'s Pentagon SUMF ¶ 35.  On

August 22, McIver provided her Pentagon supervisors with a second doctor's note, from

physician Erika Herrera, stating that McIver "underwent surgery on July 20, 2014" and "may return to work on 8/25/2014 light duty until further notice." Pl.'s Pentagon SDF ¶ 35. On August 26, however, due her failure to provide what the Medical Division considered adequate documentation regarding her medical status, McIver was officially placed on "Medically Not Cleared" status and her medical clearance case was referred to the Pentagon's Medical Review Board for further review. Def.'s Pentagon SUMF ¶ 37.

On that same day, Dennis Smith responded to McIver's August 7 FMLA request. Dkt. 39, Ex. 35 at 1. Smith denied McIver's request for an alternative shift. *Id.* ("Unfortunately, I do not have an assignment available for you for the work schedule that you requested."). Smith's email informed McIver that the FMLA "guarantees employees the opportunity to take up to 12 weeks of unpaid leave . . . for purposes of caring for a family member," but that it "does not require [the Pentagon] to assign you to a specific shift." *Id.* In the same email, Smith also retroactively granted McIver's requests for leave under the FMLA, effective July 15, 2014. *Id.* McIver subsequently provided documentation requesting FMLA leave for the period beginning July 15, 2014, and continuing through October 31, 2014, and those requests were also approved. Def.'s Pentagon SUMF ¶¶ 41–42.

McIver's physician cleared her to return to full duty with no restrictions on October 23, 2014, and again on December 18, 2014. *Id.* ¶ 43. Upon receiving the December doctor's note, the Pentagon assigned McIver to perform office administrative work for several weeks while she waited to attend the March 2015 FLETC training and the associated pre-training. *Id.* ¶ 45. But McIver subsequently requested, and the Pentagon approved, additional requests for leave extending through January 30, 2015. *Id.* ¶ 46.

On January 27, 2015, the Medical Division notified McIver that it had updated her status to "Medically Cleared" and that she was eligible to return to full duty.  *Id.* ¶ 47.  On January 28, Smith contacted McIver to inform her of the Pentagon's expectation that she would attend the next training course at FLETC in Glynco, Georgia, beginning in March 2015.  *Id.* ¶ 48.  When McIver reported for duty on February 2, 2015, Smith reiterated that she would be expected to report to FLETC for the training course beginning on March 9 and continuing through May 29, 2015.  *Id.* ¶ 49.

The following week, however, McIver contacted the Pentagon's Deputy Director of Training to inform him that she would be unable to attend the FLETC training in March 2015 due to her caregiving responsibilities to her mother.  *Id.* ¶ 51.  On March 4, McIver contacted McVicker to ask where she should report for work on March 9 if she did not report to the FLETC training.  *Id.* ¶ 53.  Smith responded to McIver's inquiry, reiterating the Pentagon's expectation that she report to FLETC in Glynco, Georgia to attend the training; Smith notified McIver that there was no alternate reporting location and that her failure to report to FLETC on March 9 would result in her being placed in absent without leave ("AWOL") status.  *Id.*  On March 8, McIver emailed Smith and reiterated that she would not be able to report to FLETC the following day.  *Id.* ¶ 54.  When McIver subsequently failed to report to FLETC, the Pentagon placed her in an AWOL status.  *Id.* ¶ 55.

On March 25, 2015, in response to McIver's failure to attend the mandatory FLETC training course, Smith issued McIver a memorandum entitled "Unreasonable Use of Approved Leave & Availability to Satisfy a Condition of Continued Employment."  *Id.* ¶ 56; *see* Dkt. 39, Ex. 64 (Smith Memorandum) at 1.  The memorandum began by stating that successful completion of the FLETC training was a requirement of continued employment as a Pentagon

police officer and that McIver had previously acknowledged this fact in writing.  Smith

Memorandum at 1.  The memorandum then stated that McIver's failure to attend the required

FLETC training in March had caused her to "continue to be ineligible to perform the full range

of police officer duties."  *Id.* at 2.  It emphasized that her unavailability for full duty was

"directly related to [her] failure to attend FLETC."  *Id.* at 3.  And it informed McIver that "[the

Pentagon Force Protection Agency] does not have any permanent light duty positions" and that

"the light duty assignments that [the Pentagon Force Protection Agency] does have are available

only to those officers who are temporarily unable (*for personal medical reasons*) to perform the

full range of their essential duties."  *Id.* (emphasis in original).  Finally, the memorandum asked

McIver to provide written notice that she would attend the next FLETC training in July 2015 or

to "propose an alternate course of action."  *Id.*

   In a letter dated April 8, 2015, McIver responded to Smith's March 25 memorandum.

Def.'s Pentagon SUMF ¶ 64.  McIver's letter made no mention of whether she ever intended to

participate in the required FLETC training.  Instead, it stated, "[a]s an alternate course of action,

I request to be placed in an alternate position until I find other employment."  *Id.*  The Pentagon

responded in two letters dated May 8, 2015.  *Id.* ¶ 66.  The Pentagon's first letter denied

McIver's request for reassignment and informed her that she was not "qualified to perform the

full range of essential duties as a [Pentagon] Police Officer (due to [her] failure to successful[ly]

complete FLETC training)."  *Id.*  The letter also directed her again to indicate whether she

intended to attend the next FLETC training in July 2015.  *Id.*

   The second letter placed McIver on notice of leave restriction due to her excessive

absences and her AWOL status between March 9, 2015 and March 21, 2015, following her

refusal to attend the FLETC training.  *Id.* ¶ 67.  The letter provided McIver with detailed

instructions regarding requirements for her to properly request leave, including the requirement that she request leave in advance absent an emergency. *Id.* And it cautioned her that failure to comply with these instructions would result in her being placed in an AWOL status. *Id.*

On June 26, 2015, McIver submitted a request for retroactive sick leave to cover the time period from June 15, 2015 through the date of the request. *Id.* ¶ 68. Smith denied McIver's request and placed McIver in an AWOL status, in accordance with the May 8 letter imposing leave restrictions on McIver. *Id.* ¶ 69. Soon thereafter, McIver accepted a new position with the Washington Naval Yard, separating from the Pentagon and transferring into her new employment effective June 28, 2015. *Id.* ¶ 70.

## B. Olejnik's Employment with the Pentagon

Robert Olejnik is a Caucasian male who was part of the same Pentagon recruitment class as McIver; Olejnik was appointed to the Pentagon police officer position effective June 29, 2014. Pl.'s Pentagon SDF ¶ 71. The circumstances of Olejnik's employment with the Pentagon are relevant to McIver's claims regarding the Pentagon because McIver alleges that Olejnik was similarly situated to her and yet treated more favorably. Am. Compl. ¶¶ 38–41.

On July 1, 2014, Olejnik contacted the Pentagon to inform them that he was "still healing" from a recent orthoscopic hip surgery and felt "hesitant" about his ability to fully participate in all upcoming events. Pl.'s Pentagon SDF ¶ 72; *see* Dkt. 39, Ex. 80 at 3. The Pentagon's Medical Review Officer conducted a physical examination of Olejnik and based on Olejnik's functional limitations, determined that Olejnik was "Medically Not Cleared," which meant that he was ineligible to report to FLETC for the eight weeks of mandatory training scheduled to commence on July 13, 2014. Def.'s Pentagon SUMF ¶ 73. On July 9, Olejnik promptly and thoroughly responded to the Pentagon's request for additional medical

documentation regarding his injuries.  *Id.* ¶ 74.  In light of the documented medical restrictions on his activities, the Pentagon offered Olejnik a temporary assignment to light-duty work with the following schedule: Mondays through Fridays between the hours of 6 a.m. and 2:30 p.m.  *Id.* ¶¶ 75–76.  Olejnik accepted the assignment and continued in that light duty status until September 9, 2014.  *Id.*

Based on Olejnik's submission of updated medical documentation, the Pentagon upgraded Olejnik to "Medically Cleared" status on September 9.  *Id.* ¶ 77.  After being medically cleared, Olejnik no longer required a light-duty assignment.  *Id*.  But he was still unable to fulfill the essential duties of a Pentagon police officer because he had not yet attended the required FLETC training.  Accordingly, on September 19, 2014, the Pentagon issued Olejnik a Notice of Proposed Removal for Failure to Meet Conditions of Employment.  *Id.* ¶ 78.  The Pentagon proposed Olejnik's removal because he had failed to timely meet a condition of his continued employment, namely, successful completion of the FLETC training course.  *Id.*

In response to the Notice of Proposed Removal, Olejnik submitted a written reply in which he unambiguously expressed his willingness and ability to attend the next iteration of the FLETC training.  *Id.* ¶ 79.  On January 5, 2015, in response to Olejnik's representations, the Pentagon rescinded Olejnik's Notice of Proposed Removal.  *Id.* ¶ 80.  Olejnik subsequently attended the required training at the FLETC in Glynco, Georgia in March 2015, successfully completing the course in May 2015.  *Id.* ¶ 81.  Olejnik's completion of the required FLETC training allowed him to begin working as a full-time Pentagon police officer.  *Id.*

### C. McIver's Employment with the Navy

In June 2015, McIver accepted a new position with the Department of Defense as a police officer at the Washington Naval Yard.  Compl. ¶ 44; Def.'s Statement of Undisputed Material

Facts Regarding the Navy ("Def.'s Navy SUMF") ¶ 1.  The essential functions of this position

included patrolling and securing assigned areas at a top-secret Navy facility, performing access

control duties at that facility, and responding to emergency calls.  *Id.* ¶ 3.  Those functions, in

turn, require Navy police officers to wear certain protective equipment along with their firearms.

*Id.*  That equipment typically includes a Level III retention holster, which contains extra

retention functions that help prevent potential assailants from extracting the firearm from the

police officer's holster.  *Id.* ¶ 6.

Around September 2015, McIver began experiencing medical complications related to

her July 2014 ulcer surgery that she attributed to the protective equipment she was required to

wear at work.  *Id.* ¶ 13.  Specifically, McIver began experiencing "pain, nausea, dizziness, drop

in blood count, [and] gastrointestinal bleeding."  *Id.* ¶ 14 (quoting McIver Dep. at 36:12–13).  On

September 21, 2015, McIver provided the Navy with a note from her personal physician,

Towana Spriggs, which stated that McIver had reported "abdominal restriction and pain over

[her] surgical scar" since she began wearing the protective equipment, and that McIver's

"exclusion from wearing the 'protective gear and belt' would help to alleviate" those symptoms.

*Id.* ¶ 15.  On September 29, 2015, McIver also consulted with Paresh Lakhani, a Navy physician.

*Id.* ¶ 16.  Lakhani recommended that McIver return to her permanent position, but with

accommodations, stating that "Officer McIver can work full duty without restrictions but I

recommend allowing the accommodation of wearing a high ride holster."  *Id.* ¶ 17.

Following these medical consultations, McIver requested, and the Navy entertained,

several different accommodations for her symptoms.  *Id.* ¶ 18.  The Navy initially allowed

McIver to wear a Level II retention holster on a temporary basis. *Id.* ¶ 19.[3]  This was only a short-term solution, however, because the Navy deemed it unsafe for its police officers to stand guard without the full complement of required protective equipment, including a Level III holster and ballistic vest, and Navy regulations required this protective equipment. *Id.* ¶ 20.

Next, McIver requested to wear a high-ride holster. *Id.* ¶ 21.  After researching the available holsters, however, the Navy ultimately denied this request. *Id.* ¶ 22.  As the Navy's police chief explained, the high-ride holster that McIver had proposed to wear was a Level I retention holster, which the Navy deemed impermissibly dangerous for officers on patrol. *Id.* ¶ 23.  The Navy concluded that it lacked a suitable Level III high-ride holster in its inventory that would allow McIver to perform the duties of her role. *Id.* ¶¶ 24–25.  In response to a subsequent request from McIver, the Navy also researched the possibility of an adaptor that would maintain the retention capabilities of a Level III holster but make it fit more comfortably around McIver's waist. *Id.* ¶ 26.  But the relevant approval body for the Navy could not authorize use of the adaptor because it had not been field-tested and approved and therefore presented a safety issue for McIver and her co-workers working at controlled points of entry to Navy facilities. *Id.* ¶ 27.

Following the Navy's consideration of these proposals, McIver also requested to wear a padded belt in order to alleviate her symptoms. *Id.* ¶ 29; McIver Dep. at 185:16–186:9.  The Navy ultimately approved this request and permitted McIver to wear the padded belt because it concluded that the padded belt did not create a safety risk. *Id.* ¶ 29; *see also* McIver Dep. at 185:16–24.

---

[3] Level II holsters contain at least one active retention device in addition to the passive retention holster itself, but lack the full suite of retention protections that characterize Level III holsters. *Id.* ¶¶ 4–5.

**D.  Procedural History**

McIver filed her initial complaint against the Secretary on July 14, 2016.  Dkt. 1
(Compl.).  On February 9, 2017, McIver amended her complaint.  Am Compl.  Her amended
complaint alleged five claims regarding her employment at the Pentagon: (1) failure to
accommodate in violation of the Rehabilitation Act, *id.* ¶¶ 55–57; (2) retaliation in violation of
the Rehabilitation Act, *id.* ¶¶ 58–60; (3) discrimination on the basis of race in violation of Title
VII, *id.* ¶¶ 61–63; (3) discrimination on the basis of sex in violation of Title VII, *id.* ¶¶ 64–66;
and (5) disparate treatment or intentional discrimination on the basis of disability in violation of
the Rehabilitation Act, *id.* ¶¶ 67–69.  Her amended complaint also alleged a single claim
regarding her employment at the Navy Yard: that the Navy had failed to accommodate her
disability in violation of the Rehabilitation Act.  *Id.* ¶¶ 70–72.

On March 21, 2017, the Secretary filed a motion for partial dismissal.  Dkt. 20 (Mot. to
Dismiss).  The Secretary sought dismissal of McIver's three Rehabilitation Act claims regarding
her employment at the Pentagon, arguing that these claims should be dismissed for failure to
state a claim upon which relief could be granted and because McIver had failed to exhaust her
administrative remedies for the alleged violations.  Mot. to Dismiss at 2.  The Secretary also
sought to limit the scope of McIver's failure-to-accommodate claim against the Navy on the
ground that McIver had failed to exhaust administrative remedies for some portion of the
allegations in the amended complaint that corresponded to this claim.  *Id.*  The Secretary did not
seek dismissal of McIver's Title VII claims.

The matter was referred to the undersigned judge on December 5, 2017, and on July 24,
2018, the Court granted in part and denied in part the Secretary's motion for partial dismissal.
Dkt. 27 (Order on Mot. to Dismiss).  The Court granted the motion to dismiss with respect to

McIver's first and fifth claims regarding the Pentagon, *id.*, concluding that McIver had failed to exhaust her administrative remedies with respect to those two claims, *see* Mem. Op. at 7.  The Court denied the motion to dismiss with respect to McIver's retaliation claim regarding the Pentagon, allowing that claim to proceed insofar as it alleged that: (1) McIver's August 2014 and April 2015 requests for accommodation constituted protected activities under the Rehabilitation Act; and that (2) the Pentagon retaliated against McIver for these protected activities when it denied her requests in May and June 2015.  Order on Mot. to Dismiss; *see* Mem. Op. at 9–10.  Finally, the Court granted the Secretary's motion with respect to the failure-to-accommodate claim regarding the Navy, limiting that claim to allegations of events occurring no more than 45 days before November 10, 2015, the date on which McIver filed her formal administrative complaint against the Navy.  Order on Mot. to Dismiss, *see* Mem. Op. at 10.

On February 7, 2020, the Secretary filed the instant motion for summary judgment.

## II.  LEGAL STANDARD

Under Rule 56, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one that could affect the outcome of the lawsuit.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

It is well established, however, that "a plaintiff opposing summary judgment" must "substantiate [her allegations] with evidence" that "a reasonable jury could credit in support of each essential element of her claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). The moving party is entitled to summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.  ANALYSIS

The Secretary seeks summary judgment on McIver's four remaining claims: (1) a Title VII race discrimination claim regarding the Pentagon; (2) a Title VII sex discrimination claim regarding the Pentagon; (3) a Rehabilitation Act retaliation claim regarding the Pentagon; and (4) a Rehabilitation Act failure-to-accommodate claim regarding the Navy. The Court will consider these claims in turn, grouping the two Title VII claims together given their similar substance.

### A.  Title VII Claims

First, McIver claims that the Pentagon discriminated against her on the basis of race and sex in violation of Title VII. Am. Compl. ¶¶ 61–66. Title VII bars employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1).

Where a plaintiff offers only circumstantial evidence of discrimination, courts evaluate claims under Title VII using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972); *see Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010). Under that framework, the employee "must first make out a prima facie case" of

discrimination. *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). The burden then shifts to the employer to "come forward with a legitimate reason for the challenged action." *Id.* If the employer satisfies that burden, the court "must conduct one central inquiry in deciding an employer's motion for summary judgment: whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason [for its action] and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Id.* (internal quotation marks omitted). The D.C. Circuit has emphasized that "the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (alterations and internal quotation marks omitted).

If the employer carries its burden to provide evidence of a legitimate, non-discriminatory reason for the challenged action, the district court "need not—and should not—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, the court's analysis should focus on whether the plaintiff can meet his or her burden to show that the employer's explanation is merely a pretext for discrimination. *See id.*

Here, McIver's Title VII claims against the Pentagon focus principally on the Pentagon's decision to deny two of her requests for accommodation: (1) her August 2014 request for light duty following her ulcer surgery the previous month, *see* Am. Compl. ¶¶ 32–33; and (2) her April 2015 request for an alternate position following her absence at the March 2015 FLETC training, *see* Am. Compl. ¶ 37. Because the Pentagon has asserted non-discriminatory justifications for its responses to both of McIver's requests, the Court will not consider whether McIver has made out a prima facie case of employment discrimination, but will instead assess

the Pentagon's asserted justifications for its treatment of McIver and McIver's evidence that

those justifications were pretextual.

### 1. Legitimacy of the Pentagon's Justifications

Step two of the *McDonnell Douglas* analysis requires an employer to "come forward with

a legitimate reason for the challenged action." *Iyoha*, 927 F.3d at 566. The D.C. Circuit has

recently emphasized four factors that should be "paramount in the analysis" of whether an

employer has met this burden. *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019).

Namely, at step two: (1) the employer must produce evidence that would be admissible at trial

for a finder of fact; (2) "the factfinder, if it 'believed' the evidence, must reasonably be able to

find that 'the employer's action was motivated by' a nondiscriminatory reason"; (3) the

employer's justification must be "facially 'credible' in light of the proffered evidence"; and (4)

the employer must provide a "clear and reasonably specific explanation" for its action that is

"articulated with some specificity." *Id.* at 1087–88 (citations omitted). The Pentagon's

explanations of its responses to both of McIver's accommodation requests satisfy this burden.

*(a) McIver's August 2014 Request*

McIver claims that her August 2014 request for light duty work was "ignored" and that

she was "never accommodated, but instead forced to use excessive amounts of leave from July

2014 to January 2015 in order to remain employed with [the Pentagon]." Am. Compl. ¶¶ 32, 33.

To begin with, the record contains no evidence that McIver ever formally requested light duty as

an accommodation. During her recovery from ulcer surgery, McIver submitted two doctor's

notes stating that she was *able* to return to work in a light-duty capacity. But nothing in the

record states that McIver ever formally *requested* a light-duty work accommodation. *See, e.g.*,

Def.'s Pentagon SUMF ¶ 62; Smith Memorandum at 3 (encouraging McIver on March 25, 2015

to "contact Mr. Ken Rauch" if she would like to "request a reasonable accommodation"). McIver did submit formal requests under the *FMLA*, seeking reassignment to an evening shift that would allow her to care for her mother during the day, and McIver's deposition testimony suggests that she may have believed these FMLA requests also constituted a request for accommodation for her own medical difficulties.  *See* McIver Dep. at 106:1-16; *see also* Pl.'s Pentagon SDF ¶¶ 28, 31.  But the Pentagon's failure to respond to her August 2014 "request" for light duty is not surprising given that McIver never specifically requested a light-duty assignment through the Pentagon's established procedures, and her documented FMLA requests sought different accommodations.

But even crediting McIver with having formally requested light duty, the Pentagon has provided legitimate, non-discriminatory reasons for declining to grant it.  First, the Pentagon states that McIver's request "was not simply and exclusively a request to work light duty" because McIver "was also requesting to work an 'alternate shift' outside of normal business hours."  Mot. for Summ. J. at 12.  The record supports the Pentagon's explanation.  Prior to her surgery, McIver had requested to work from 2 p.m. to 10 p.m., with Tuesdays and Wednesdays off.  *See* July FMLA Request at 3.  More importantly, she formally resubmitted her FMLA request to her supervisors during her recovery from surgery, and less than a week before her first doctor's note communicated her ability to return to work in a light-duty capacity.  Def.'s Pentagon SUMF ¶ 26; *see* August FMLA Request at 1.  As a result, the Pentagon reasonably considered McIver's alternate-shift and light-duty requests in tandem and concluded that it could not accommodate her light-duty request given the unavailability of light-duty work outside of normal business hours.  *See* Dkt. 39, Ex. 11 (Smith Dep.) at 64:4–21.  To the extent that McIver was willing to forego her FMLA request and work a light-duty shift within normal hours, she did

not communicate that willingness to her supervisors.  In assessing the legitimacy of an employer's reasons for denying an employee's accommodation requests, "the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach*, 86 F.3d at 1183.  Here, the Pentagon reasonably interpreted McIver's stated availability for light-duty work in conjunction with her repeated FMLA requests for an evening shift.  The Pentagon's failure to deduce McIver's willingness to perform light duty work within normal business hours, and accommodate her accordingly, is not evidence of unlawful discrimination.

Second, the Pentagon states that McIver's "failure to timely submit the required medical documentation as she was instructed" was another basis for its August 2014 decision not to allow McIver to work light duty.  Mot. for Summ. J. at 13.  The record supports this explanation too. McIver was placed in a "Medical Hold Pending" status while she recovered from her surgery. Def.'s Pentagon SUMF ¶ 33.  On July 31, the Medical Division specifically informed her that she would need to obtain medical clearance to return to work; to obtain such clearance, the Medical Division encouraged her to submit "supplemental medical information" including "hospital records" such as surgical operative reports, discharge narratives, and doctors' notes. *Id.* ¶ 34; *see* Medical Division Request at 116.  But McIver provided the Medical Division with none of this information, not even a copy of the cursory doctor's note that she provided to McVicker.  Thus, on August 26, McIver was officially placed on "Medically Not Cleared" status, rendering her ineligible for any work, even light duty.  Def.'s Pentagon SUMF ¶ 37. Pentagon police officers are required to meet certain medical standards, *id.* ¶ 6, and the Pentagon reasonably requires documentation from employees returning from medical leave to ensure that they meet those requirements.  McIver's failure to timely submit the required documentation

18

concerning her medical status was a legitimate basis for the Pentagon to decline to afford her the work placement she sought.

    *(b) McIver's April 2015 Request*

    McIver alleges that in April 2015, she "again requested for reasonable accommodation," but that "Smith denied [her] request to be placed in an alternate position until she could find other employment, for permanent light duty status [sic] and indicated that she would be ineligible for full duty status until she reported to FLETC."  Am. Compl. ¶ 37.  Consistent with this allegation, the record reflects that on April 8, 2015, McIver wrote to the Pentagon, "[a]s an alternate course of action, I request to be placed in an alternate position until I find other employment."  *Id.* ¶ 64.  And on May 8, the Pentagon denied McIver's request, informing her that she was not "qualified to perform the full range of essential duties as a [Pentagon] Police Officer (due to [her] failure to successful[ly] complete FLETC training)."  *Id.* ¶ 66.

    The Pentagon provided legitimate justifications for its denial of McIver's request.  To the extent that McIver requested a permanent light duty role,[4] Smith had previously informed McIver, in his March 25 memorandum to her, that "[the Pentagon Force Protection Agency] does not have any permanent light duty positions" and that "the light duty assignments that [the Pentagon Force Protection Agency] does have are available only to those officers who are temporarily unable (*for personal medical reasons*) to perform the full range of their essential duties."  Def.'s Pentagon SUMF ¶ 60; Smith Memorandum at 3 (emphasis in original).  It would have been unreasonable for McIver, who had been hired by the Pentagon as a full-duty police

---

[4] Notwithstanding the allegations of the complaint, which describe McIver's April 2015 request as seeking "permanent light duty status," Am. Compl. ¶ 37, McIver testified in her deposition that a request for permanent light-duty status was "not reasonable" and denied having made one. *See* McIver Dep. at 157:2–3 ("No, it's not reasonable and I didn't ask for that.").

officer, to expect to remain employed in a permanent light-duty capacity.  The Pentagon, meanwhile, reasonably adhered to its generally applicable and non-discriminatory policy that permanent light-duty positions were unavailable.

The Pentagon also provided a legitimate justification for its denial of McIver's request "to be placed in an alternate position until [she could] find other employment."  Def.'s Pentagon SUMF ¶ 64.  In the same March 25 memorandum to McIver—which followed her second failure to attend the FLETC training—Smith reiterated that successful completion of the FLETC training was a requirement of continued employment as a Pentagon police officer.  Smith Memorandum at 1.  Smith explained that McIver's failure to attend the required FLETC training in March had caused her to "continue to be ineligible to perform the full range of police officer duties."  Def.'s Pentagon SUMF ¶ 59; Smith Memorandum at 2.  And subsequently, in denying McIver's April 2015 request, the Pentagon reiterated that McIver was not "qualified to perform the full range of essential duties as a Pentagon Police Officer (due to [her] failure to successful[ly] complete FLETC training)."  Def.'s Pentagon SUMF ¶ 66.

That fact alone fully justified the Pentagon's failure to grant McIver the alternate role that she sought.  The Pentagon had hired McIver as a police officer.  *Id.* ¶ 11.  The core duties of a Pentagon police officer, which include "force protection, security, and law enforcement," *id.* ¶ 1, required that all new Pentagon police officer recruits successfully complete all assigned training, including the twelve-week FLETC training course that took place in July 2014 and again in March 2015, *id.* ¶ 8.  McIver failed to attend the FLETC training on both occasions, despite ample notice of her obligation to do so.  *See, e.g.*, *id.* ¶¶ 48, 49.  After McIver failed to complete the basic requirements of the job for which she had been hired, the Pentagon was justified in declining to obtain an "alternate position" for her.

### 2.   McIver's Evidence of Pretext

At step three of the *McDonnell Douglas* framework, a plaintiff must "produce[] sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason [for its action] and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Iyoha*, 927 F.3d at 566.  One way for a plaintiff to establish pretext is to present "evidence suggesting that the employer treated other employees of a different race [or sex] . . . more favorably in the same factual circumstances." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (internal quotation marks omitted).

In challenging the Pentagon's stated justifications for its actions, McIver relies principally on the Pentagon's treatment of Robert Olejnik, a Caucasian male member of McIver's Pentagon recruitment class who was permitted to work in a light-duty capacity while he recovered from hip surgery.  *See* Am. Compl. ¶¶ 38–41; Dkt. 42 (Opp'n to Mot. for Summ. J.) at 8 ("Throughout this litigation, [McIver] has alleged that she was treated less favorably than a similarly situated recruit Robert Olejnik.").  McIver contends that Olejnik was similarly situated to her because he also failed to attend the July 2014 FLETC training and he also experienced medical complications during his employment with the Pentagon.

But Olejnik was not similarly situated to McIver in material ways.  Three differences between Olejnik's and McIver's employment circumstances stand out.  First, Olejnik's unquestioned availability to work normal daytime hours allowed the Pentagon to assign him to temporary light duty on Mondays through Fridays between the hours of 6 a.m. and 2:30 p.m.  Def.'s Pentagon SUMF ¶ 76.  McIver, meanwhile, informed the Pentagon of her ability to return to work in a light-duty capacity only while simultaneously pressing repeated, formal FMLA requests for assignment to an evening and weekend shift, during hours in which light-duty work

was unavailable.  *See* July FMLA Request at 3; August FMLA Request at 1; Smith Dep. at 64:4–21.  Second, Olejnik promptly and thoroughly responded to the Pentagon's request for additional medical documentation regarding his injuries.  Def.'s Pentagon SUMF ¶ 74.  McIver's corresponding failure to provide the documentation requested by Medical Division made it difficult for the Pentagon to medically clear her for a return to work in any capacity.  Finally, Olejnik actually attended the required FLETC training in March 2015, successfully completing the course in May 2015.  *Id.* ¶ 81.  In contrast, McIver failed to attend the March training, which rendered her unable to perform the duties of a Pentagon police officer despite having spent almost a year on the job.  *See, e.g.*, *id.* ¶ 66.  In other words, none of the Pentagon's justifications for denying McIver's various requests applied to Olejnik, who (1) was not pressing simultaneous FMLA requests to work non-standard hours; (2) promptly and thoroughly provided all medical documentation that the Pentagon requested; and (3) attended the March 2015 FLETC training that was a condition for his continued employment as a Pentagon police officer.

Moreover, to the extent that McIver's and Olejnik's situations were comparable in certain respects, the record reflects that the Pentagon treated Olejnik more harshly than McIver in other ways.  First, once Olejnik fully recovered from his hip surgery, the Pentagon formally proposed his termination by issuing him a Notice of Proposed Removal for Failure to Meet Conditions of Employment due to his failure to attend the FLETC training course the previous summer.  Def.'s Pentagon SUMF ¶ 78.  The Pentagon never issued McIver a Notice of Proposed Removal notwithstanding her failure to complete the same required training.  Second, the Pentagon rescinded Olejnik's Notice of Proposed Removal only after he unambiguously expressed his willingness and ability to attend the next iteration of the FLETC training, *id.* ¶ 79, and only then did the Pentagon afford Olejnik a limited conditional duty assignment in anticipation of his

attendance at the training.  But when McIver returned to work in February 2015, the Pentagon immediately afforded her a similar conditional duty assignment even though she never confirmed her willingness to attend the mandatory FLETC training.  *Id.* ¶ 45.

In short, the Pentagon's treatment of Olejnik does not give rise to an inference that its stated justifications for its treatment of McIver were pretextual.  As explained, Olejnik was not similarly situated to McIver, nor was he treated more favorably than McIver in relevant respects. And nothing else in the record suggests that the Pentagon's denials of McIver's requests were motivated by her race or sex.  Because McIver has not "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason [for its action] and that the employer intentionally discriminated against the plaintiff on a prohibited basis," *Iyoha*, 927 F.3d at 566, the Court will grant the Secretary's motion for summary judgment with respect to McIver's Title VII claims.

## B. Retaliation Claim

Second, McIver claims that the Pentagon retaliated against her for engaging in protected activity under the Rehabilitation Act.  *See* Am. Compl. ¶¶ 58–60.  The Rehabilitation Act makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or an account of his or her having exercised or enjoyed . . . any right granted or protected by this chapter."  42 U.S.C. § 12203(b).  An employee claiming a violation of this provision must establish that "(i) '[s]he engaged in statutorily protected activity'; (ii) '[s]he suffered a materially adverse action by h[er] employer'; and (iii) 'a causal link connects the two.'"  *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014) (alterations in original) (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)).  Where, as here, a plaintiff offers only

circumstantial evidence of retaliation, her claim is governed by the same *McDonnell Douglas* burden-shifting framework described above.  *Id.*

In its memorandum opinion granting in part the Secretary's motion to dismiss, the Court narrowed the scope of McIver's retaliation claim.  The Court held that McIver's retaliation claim could survive the Secretary's motion to dismiss only insofar as it alleged that (1) the Pentagon had retaliated against McIver for her August 2014 and April 2015 requests for accommodation; and that (2) the Pentagon's May and June 2015 denials of McIver's requests formed the basis of the challenged adverse actions.  *See* Mem. Op. at 10.  The Court reached that conclusion because only McIver's August 2014 and April 2015 requests for accommodation following her own ulcer surgery—not her June and July 2014 requests for leave to care for her mother, which predated her surgery—constituted protected activity under the Rehabilitation Act.  *Id.* at 9.  And McIver's July 2015 administrative complaint, which exhausted her administrative remedies for the retaliation claim now before the Court, referenced only the Pentagon's May and June 2015 denials of her accommodation requests as the allegedly retaliatory activities.  *Id.* at 8.

The Secretary is entitled to summary judgment on McIver's retaliation claim for largely the same reasons described above with respect to her Title VII claims.  The Pentagon articulated legitimate, non-discriminatory explanations for its May and June 2015 denials of McIver's requests.  As Smith explained to McIver prior to the Pentagon's May 2015 decision, "[the Pentagon] does not have any permanent light duty positions" and "the light duty assignments that [the Pentagon] does have are available only to those officers who are temporarily unable (*for personal medical reasons*) to perform the full range of their essential duties."  Smith Memorandum at 3.  Moreover, the Pentagon reasonably denied McIver's request "to be placed in an alternate position until [she could] find other employment," Def.'s Pentagon SUMF ¶ 64,

because the Pentagon had hired McIver as a police officer, yet she remained not "qualified to perform the full range of essential duties as a [Pentagon] Police Officer" due to her repeated failure to complete the required training for that role, *id.* ¶ 66.  The Pentagon reasonably declined to reassign McIver to a job other than the one for which they had hired her.

To the extent that McIver also challenges the Pentagon's June 2015 denial of her request for sick leave as unlawful retaliation, the Pentagon also articulated a legitimate, non-discriminatory justification for that action.  In its second May 8, 2015 letter, the Pentagon specifically informed McIver that going forward, she would be required to request leave in advance absent an emergency.  *Id.* ¶ 67.  That innocuous requirement was reasonable given that the Pentagon had employed McIver for almost a year, McIver had spent the majority of her employment on various forms of leave, and McIver had twice failed to attend the mandatory training course for her position, the second time landing her in AWOL status and rendering her unable to fulfill the duties of her position for several months to come.  McIver's June 26 request for retroactive sick leave plainly failed to comply with the reasonable leave procedures that the Pentagon had imposed.  *Id.* ¶ 68.  Adhering to those procedures was a legitimate and non-discriminatory reason for denying McIver's retroactive request for leave.

Nothing in the record suggests any causal link between the Pentagon's May and June 2015 denials of McIver's requests and McIver's engagement in protected activities under the Rehabilitation Act.  Once again, in challenging the Pentagon's proffered explanations for its actions, McIver relies mainly on the Pentagon's allegedly more favorable treatment of Olejnik. But for the reasons explained above, Olejnik was not similarly situated to McIver, nor was he treated more favorably than McIver in any relevant respects.  The record contains no other evidence that the Pentagon's May and June 2015 denials of McIver's requests were motivated by

hostility toward McIver or by retaliation for her previous engagement in protected activities under the Rehabilitation Act.  Rather, the Pentagon's actions were justified by McIver's repeated inability to comply with the requirements of the job that the Pentagon had hired her to do. Accordingly, the Court will grant the Secretary's motion for summary judgment with respect to McIver's retaliation claim.

## C.  Failure-to-Accommodate Claim

Finally, McIver claims that the Navy failed to provide her with a reasonable accommodation for her disability as required under the Rehabilitation Act.  *See* Compl. ¶¶ 70–72.[5]  "To make out a prima facie case of discrimination based on a failure to accommodate, a 'plaintiff must demonstrate by a preponderance of the evidence: (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of her job; and (4) that the employer refused to make such accommodations.'"  *McNair v. District of Columbia*, 359 F. Supp. 3d 1, 8 (D.D.C. 2019) (quoting *Etheridge v. FedChoice Federal Credit Union*, 789 F. Supp. 2d 27, 35 (D.D.C. 2011)).  For the purposes of this motion, the Secretary concedes the first three elements of McIver's failure-to-accommodate claim and challenges only the fourth.  Mot. for Summ. J. at 23.  Accordingly, "[t]o survive summary judgment, [McIver] must demonstrate that the [Navy] failed to provide reasonable accommodations that would have allowed her to perform her essential employment functions." *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 78 (D.D.C. 2012).

---

[5] In denying the Secretary's motion to dismiss that claim on exhaustion grounds, the Court previously limited the scope of the claim to allegations of events occurring within a 45-day period of November 10, 2015 (the date on which McIver filed her formal administrative complaint making the claim).  *See* Mem. Op. at 10.

McIver cannot make this showing, however, because the Navy *did* provide a reasonable accommodation for her disability by allowing her to wear a padded belt.  Def.'s Navy SUMF ¶ 29; McIver Dep. at 185:16–186:9.  McIver specifically requested this accommodation, and the Navy granted it because it concluded that wearing the padded belt would ameliorate McIver's symptoms without creating a safety or security risk to McIver or her co-workers.  Def.'s Navy SUMF ¶ 29; McIver Dep. at 185:16–24.  Nothing in the record suggests that McIver ever complained to the Navy that the padded belt was inadequate.  "[A]ccommodations are reasonable if they allow the employee to perform the essential functions of the job without imposing undue hardship on the employer."  *Leiterman v. Johnson*, 60 F. Supp. 3d 166, 180 (D.D.C. 2014) (quotation omitted).  Because the Navy reasonably accommodated her disability, McIver cannot survive summary judgment on her failure-to-accommodate claim.

Even if McIver had established a prima facie failure-to-accommodate claim, however, the Secretary would be entitled to summary judgment.  McIver proposed three accommodations for her disability that the Navy considered and rejected (before authorizing the padded belt): a Level II holster, a high ride holster, and an adaptor for her Level III holster.  But the undisputed facts establish that the Navy rejected each of these proposals for a legitimate reason: ensuring the safety of McIver and her fellow police officers and the security of the Navy's facilities.  *See* Def.'s Navy SUMF ¶¶ 19–20 (Level II holster); *id.* ¶¶ 22–25 (high ride holster); *id.* ¶¶ 27–28 (adaptor for Level III holster).  "Although employers have a duty [under the Rehabilitation Act] to engage with their employees in an interactive process to identify a reasonable accommodation, the employer has the ultimate discretion to choose between effective accommodations."  *Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019) (internal quotation marks and citation omitted).  Here, the Navy satisfied its duty to engage in an "interactive process" with McIver, *id.*, and

27

carefully considered each of her proposals in an effort to accommodate her.  However, the Navy

had the "ultimate discretion" to reject proposed accommodations that would jeopardize the safety

and security of its operations, and instead select one that would not.  *Id.*

In seeking to avoid summary judgment, McIver principally contends that she should have

been "downloaded"—that is, allowed to perform administrative tasks that would not have

required her to carry a firearm—in light of the pain that her equipment caused her.  *See* Opp'n to

Mot. for Summ. J. at 18–21.  This argument fails.  For one thing, while the record contains

detailed evidence that McIver requested (and the Navy considered) several alterations to her

equipment, *see, e.g.*, Def.'s Navy SUMF ¶¶ 18–29, nothing in the record suggests that McIver

ever requested to be "downloaded."  For another, Dr. Lakhani specifically noted in his medical

assessment that McIver could "work full duty without restrictions," *id.* ¶ 17, which runs counter

to McIver's argument that a "download" was necessary.  Most importantly, though, the Navy's

refusal to "download" McIver would not have violated the Rehabilitation Act because being

"downloaded" is not an accommodation that would have allowed her to perform the "essential

functions" of her role as a Navy police officer.  *See Bonnette*, 907 F. Supp. 2d at 78.  It is

undisputed that the essential functions of a Navy police officer include "patrolling Navy

installations in a top secret facility," "performing access control duties," and "working in a top

secret building," and that these functions require the officer to "wear and utilize the required

protective equipment, gear, and firearm."  Def.'s Navy SUMF ¶ 3.  Being "downloaded" would

have rendered McIver unable to perform these duties and is not, therefore, a reasonable

accommodation that the Navy was required to provide under the Rehabilitation Act.

Accordingly, the Court will grant the Secretary's motion for summary judgment with respect to

McIver's failure-to-accommodate claim against the Navy.

**CONCLUSION**

For the foregoing reasons, the Court will grant the Secretary's motion for summary judgment.  A separate order consistent with this decision accompanies this memorandum opinion.

---

DABNEY L. FRIEDRICH
United States District Judge

Date: April 28, 2020